18387

Ashton PARROTT, Respondent, v. PLOWDEN MOTOR COMPANY,
Appellant
(143 S. E. (2d) 607)

*Messrs. Wright, Scott, Blackwell & Powers,* of Florence, *for Appellant,*

*Messrs. McEachin, Towsend & Zeigler,* of Florence, *for Respondent,*

August 4, 1965.

TAYLOR, Chief Justice.

This appeal arises out of an action for malicious prosecution. The plaintiff recovered judgment against defendant for both actual and punitive damages in The Civil Court

of Florence, in May, 1964. Timely motions for nonsuit, directed verdict, judgment n. o. v. or in the alternative for a new trial were made by defendant and denied. This appeal followed.

The complaint alleges that defendant acting through its duly authorized agent caused plaintiff to be arrested under a warrant charging him with disposing of a pickup truck while under an alleged lien. As a result thereof he was later indicted; and upon trial, after the jury was empaneled and sworn and the State submitted its evidence, the Solicitor ordered a *nol pros*.

Plaintiff purchased a 1954 Ford pickup truck from the Floyd Motor Company of Lake City, S. C., on September 11, 1959, giving a chattel mortgage thereon to Floyd's in the amount of $349.00, payable in monthly installments of $30.00 each, the last such payment being made by plaintiff on October 15, 1960. The mortgage provided that "It is agreed that the title to, ownership in and right of possession of said chattel are vested in you and your assigns until said indebtedness and all other sums of money payable to you, whether evidenced by note, bank account, or otherwise, * * * shall have been fully paid in money at which time ownership shall pass to me."

On December 2, 1961, plaintiff traded the 1954 truck to the defendant, Plowden Motor Company of Lake City, S. C., for a 1957 Ford pickup truck. Plaintiff did not give defendant the title to the 1954 truck, stating that it was lost but that the truck was "paid for in full." The 1954 truck stayed on the premises of Plowden Motor Company until September, 1962, at which time it was discovered that title had not been acquired. When a duplicate title was received from the Highway Department the mortgage to Floyd Motor Company had not been satisfied on the records of the Highway Department. The title was sent to Floyd Motor Company but returned as there was a claimed balance owed thereon by plaintiff. Plaintiff upon being

contacted denied owing Floyd's anything. After further meetings and conversations with plaintiff in which defendant was assured the matter would be cleared up, an employee of defendant contacted the Honorable Russell Floyd, Magistrate at Lake City, who is also an attorney. Floyd after several conversations with plaintiff, advised defendant's employee that he was entitled to a warrant.

To maintain an action for malicious prosecution, plaintiff must show (1) the institution or continuation of original judicial proceedings, either civil or criminal; (2) by, or at the instance of, the defendant; (3) termination of such proceeding in plaintiff's favor; (4) malice in instituting such proceedings; (5) want of probable cause, and (6) resulting injury or damage. 34 Am. Jur., Malicious Prosecution, Sec. 6, p. 706; *Prosser v. Parsons,* S. C., 141 S. E. (2d) 342; *Gibson v. Brown, et al.,* S. C., 141 S. E. (2d) 653.

Defendant contends the only inference to be drawn from the evidence was that plaintiff sold an automobile upon which there existed a lien and that plaintiff failed to establish malice in instituting the proceedings or want of probable cause.

Floyd Motor Company claimed plaintiff owed it the amount of $92.96 for repairs to the 1954 truck and the amount of $84.00 claimed to be transferred from the account on a 1956 Ford Station Wagon purchased by plaintiff on which Floyd's had satisfied the mortgage. It is contended that these items are included, under the quoted section of the chattel mortgage, in the total amount of the lien on the 1954 pickup truck. At the trial plaintiff introduced evidence to the effect that he had made twelve payments of $30.00 to Floyd Motor Company or a total of $360.00 when the note and chattel mortgage only called for payments totaling $349.00.

The question before this Court is not whether plaintiff was guilty of disposing of property under lien but whether defendant had probable cause to believe him guilty.

Under Section 45-157, Code of Laws of South Carolina, 1962, it is a misdemeanor to sell or dispose of personal property on which any mortgage or lien exists without the written consent of the mortgagee or lienee. However, this section does not apply when the sale is made without knowledge or notice of such mortgage or lien by the person so selling such property.

"* * * it is generally held that the prosecutor is free from damage if there be probable cause for the accusation made, the burden being upon the plaintiff to show the absence of probable cause as a part of the cause of action, *Fulmer v. Harmon,* 3 Strob. 576; *Hogg v. Pinckney,* 16 S. C. 387, see also, 6 South Carolina Law Quarterly 375-376.

"By probable cause is meant the extent of such facts and circumstances as would excite the belief in a reasonable mind acting on the facts within the knowledge of the prosecutor that the person charged was guilty of a crime for which he has been charged, and only those facts and circumstances which were or should have been known to the prosecutor at the time he instituted the prosecution should be considered. *Brown v. Bailey,* 215 S. C. 175, 54 S. E. (2d) 769; *China v. Seaboard Air Line Ry.,* 107 S. C. 179, 92 S. E. 335." *Elletson v. Dixie Home Stores,* 231 S. C. 565, 99 S. E. (2d) 384.

In an action for malicious prosecution, the defendant must be absolved from liability if plaintiff fails to show that the prosecution was instituted maliciously and without probable cause. *Margolis v. Telech,* 239 S. C. 232, 122 S. E. (2d) 417.

Although malice may be inferred from a want of probable cause, a want of probable cause cannot be inferred from any degree of malice. *Stoddard v. Roland,* 31 S. C. 342, 9 S. E. 1027; *Brown v. Bailey,* 215 S. C. 175, 54 S. E. (2d) 769.

While the question of want of probable cause is ▮▮ essentially a question of fact and is ordinarily for the determination of the jury, we are of opinion that the evidence will support no finding other than that defendant had probable cause in instituting the prosecution against plaintiff for disposing of personal property under lien. Although prior to the warrant being obtained, plaintiff stated he did not owe Floyd Motor Company anything further on the 1954 pickup, defendant was only aware of the fact that the duplicate title obtained from the Highway Department indicated the lien was unsatisfied and that Floyd Motor Company claimed a balance due thereon. Plaintiff was contacted more than once but at no time did he endeavor to explain his position in the controversy or offer to defendant or the magistrate any information indicating the amount claimed was not owed.

For the foregoing reasons we are of opinion that plaintiff's action must fail, the verdict and judgment appealed from should be reversed; and it is so ordered.

Reversed.

Moss, J., and LEGGE, Acting J., concur.

LEWIS and BUSSEY, JJ., dissent.

BUSSEY, Justice (dissenting) :

Being of the view that there was sufficient evidence tending to prove all of the essential elements of a cause of action for malicious prosecution, including lack of probable cause, I think that the judgment of the lower court should be affirmed.

In passing upon whether the issue of lack of probable cause should have been submitted to the jury, it is elementary that all of the evidence, together with the inferences reasonably deducible therefrom, must be considered in the light most favorable to the respondent. I, accordingly, review the evidence and state the facts in that light. Necessary to an understanding of the issue is a brief history of the

various business dealings between respondent and one Cecil Floyd, an individual doing business as Floyd Motor Company, out of which dealings this litigation arose.

Over a period of several years these two parties had considerable dealings. Respondent purchased at least two automobiles from Floyd on the installment plan; as a contractor, painted Floyd's house for him, and also sold Floyd certain materials. The chattel mortgage, out of which this controversy actually arose, was given by the respondent to Floyd in September 1959, in connection with the purchase of a used pickup truck. The face amount of this mortgage, including interest and carrying charges, was $349.00, and the payments were at the rate of $30.00 per month. Respondent made twelve such thirty dollar payments with reasonable promptness and regularity, making the twelfth payment in October 1960, which actually overpaid the face amount of that mortgage in the sum of $11.00.

Floyd's claim of a balance due him on the particular mortgage account, asserted two years later in October 1962, arose out of and was based on certain charges made by Floyd on his ledger account by virtue of the "omnibus" indebtedness provision of the chattel mortgage, quoted in the opinion of the Chief Justice. The first of these charges was in the amount of $92.96, charged to the account of respondent for repairs on October 8, 1959. The circumstances which gave rise to this charge were that the truck within thirty days after its purchase, required major repairs. There is evidence to the effect, however, that the truck was fully warranted by Floyd for a thirty day period, and, in fact, Floyd did not deny that it was so warranted. The evidence further reflects that respondent did not know of this charge or the nature thereof until after he was prosecuted by appellant in this action, and it is clearly inferable that Floyd was not entitled to the charge.

The second charge entered by Floyd on this account was in the amount of $84.00, which arose in the following

manner. Respondent was paying Floyd on a mortgage on a station wagon as to which Floyd's ledger account showed a balance of $484.00 on November 16, 1960. On that date, which was approximately one month after respondent's last monthly payment on the truck mortgage, respondent gave Floyd a check in the amount of $400, and obtained from Floyd a satisfaction of the mortgage on the station wagon preparatory to trading same to appellant. The evidence about the remaining ledger balance in the amount of $84.00 is conflicting. Floyd contends that he was authorized by respondent to transfer it to the mortgage account on the pickup truck, such being, however, sharply disputed by respondent, who contended that the four hundred dollar payment paid the mortgage on the station wagon in full. What rebate, if any, with respect to finance charges, insurance, etc., respondent would have been entitled to upon prepayment of that mortgage is not mentioned in the evidence.

Approximately three months after the mortgage on the station wagon was satisfied, respondent concluded painting Floyd's house for him, and, at the conclusion of the painting contract, Floyd paid respondent all of the contract price save $64.00, which he, Floyd, credited against the claimed balance of $84.00 on the station wagon account, leaving a net balance on that particular account in the amount of $20.00, carried forward on Floyd's ledger and charged to the truck mortgage account.

From the foregoing, it is clearly inferable that when these parties had a settlement between them in February, 1961, Floyd deducted everything which he believed respondent owed him. From February, 1961, until October, 1962, when Floyd claimed a balance due him in connection with the truck mortgage, the record does not reflect that there were any dealings between these two parties other than that there is evidence to the effect that respondent sold to Floyd, through one of his agents, certain materials for which respondent has not yet been paid. The exact amount of

this indebtedness, or the date or dates when incurred, is not in the record before us. In any event, it does not appear that either Floyd or respondent billed or made any claim, one against the other, from February 1961 until October, 1962.

From the foregoing, the evidence clearly supports the inference that, in point of fact, respondent owed Floyd absolutely nothing in October, 1962, on the truck mortgage account, or otherwise, and, in fact, Floyd may very well have owed respondent a few dollars instead. Respondent, a man of limited education, frankly admitted that a mutual accounting might result in a small difference one way or the other.

When respondent traded the truck to appellant, according to his record, his knowledge, information and belief, the entire mortgage account on the truck had been fully paid approximately fourteen months prior thereto. Floyd made no claim as to any balance being due him on the truck mortgage account until approximately two years after respondent had actually overpaid the face amount of the mortgage to the extent of $11.00. By way of recapitulation, Floyd's belated claim, in the net amount of $101.96, was based on the following items:

| | |
|---|---:|
| Disputed repair bill ............... | $92.96 |
| Disputed net balance on station wagon account ........................ | 20.00 |
| | $112.96 |
| Less overpayment on face amount of mortgage ...................... | 11.00 |
| | $101.96 |

The record does not disclose precisely which statute appellant charged respondent with violating, but it is inferential that he was charged with the violation of Code Section 45-4, rather than Code Section 45-157. Section

45-4 is designed by its terms to protect a purchaser, such as appellant, from an undisclosed lien, and that is the section referred to in the exceptions of appellant here. The pertinent portion of that section reads as follows:

"Any person who shall wilfully and knowingly sell and convey any real or personal property on which any lien exists without first giving notice of such lien to the purchaser of such real or personal property shall be deemed guilty of a misdemeanor  *  *  *."

The gravamen of the offense is not simply disposing of property upon which a lien exists, but rather, willfully and knowingly doing so without disclosing the existence of a valid lien to the purchaser. All of the circumstances disclosed by the record rather clearly indicate that respondent did not violate this section of the Code. The question, however, is not whether he committed the offense, but whether or not appellant had probable cause for the prosecution.

The prosecution of respondent was brought about by two agents of appellant, one Russell Humphries, secretary-treasurer of appellant, and one Webster who acted under the supervision of the said Humphries. Webster was the one who signed the warrant upon the authorization of Humphries. In determining whether they, or either of them, had probable cause for believing that respondent had actually violated the law, only the facts and circumstances which were or should have been known to them at the time the prosecution was instituted are to be considered. Admittedly, they did not know all of the ramifications of the dealings between respondent and Floyd, or the basis of Floyd's disputed claim, but whether or not they, in the exercise of ordinary prudence or caution, should have known of certain facets thereof is another matter.

When Floyd's claim was first brought to the attention of respondent, in October, 1962, by Humphries, respondent flatly and repeatedly denied to both Humphries and Webster

that he owed Floyd anything on the truck mortgage. As mentioned above, respondent is a man of somewhat limited education whose wife attended to most of his clerical work. On the other hand, the record is clear that he is a man of substance, apparently of good repute, owned more than one parcel of real estate in Lake City, and was engaged in the contracting business, his place of business being directly across the street from that of appellant. He had had previous business dealings with appellant, and there is no suggestion that he was not thoroughly reliable in such dealings.

When contacted by Humphries and Webster about Floyd's claim, he promised to try to get the matter straightened out with Floyd. Not knowing the basis of Floyd's claim, respondent, of course, could not tell appellant's agents what the controversy was about. On the other hand, they asked appellant for no proof of payment but simply took the position that it was a matter for respondent to straighten out with Floyd. According to the evidence, respondent contacted Floyd but could obtain no satisfactory explanation or information from Floyd. The appellant's agents were pressing respondent to get the matter straightened out over a period of several weeks before the warrant was actually issued. During this period of time respondent was confined to his home for a while with pneumonia.

Humphries testified that he saw the actual mortgage held by Floyd prior to the institution of the prosecution, but made no effort to ascertain the basis of Floyd's claim. If Humphries looked at the mortgage as he said he did, he would have seen that the face amount of the mortgage, in accordance with the terms, should have been fully paid two years earlier. That circumstance alone, it seems to me, was sufficient to put a person of ordinary prudence and reason on notice and inquiry as to why Floyd had not sooner taken action thereabout if there was any validity to his claim. I think it is certainly not normal for an automobile dealer to sit idly by for two years with a valid mortgage against a motor vehicle without making any effort to enforce the same.

In 34 Am. Jur. 735, Malicious Prosecution, Section 51, it is said,

"The failure of a person who has received information tending to show the commission of a crime to make such further inquiry or investigation as an ordinarily prudent man would have made in the same circumstances, before instituting a proceeding, renders him liable for proceeding without probable cause. One may not rely without further investigation on representations of another where the information received is such as to put an ordinarily prudent and cautious person on inquiry, or, it has been held, where he has no personal knowledge of the truth of the representations."

Neither Humphries nor Webster had any personal knowledge as to whether, in point of fact, any balance was due Floyd. On the other hand, they were informed by respondent, a reputable business man, that he, in fact, owed Floyd nothing on the truck. Under these unusual circumstances, appellant's agents made no effort whatever to even ascertain the basis of Floyd's alleged claim.

In 34 Am. Jur. 733, Malicious Prosecution, Section 49, it is said,

"According to the generally accepted view, probable cause does not depend on the actual state of the case in point of fact, but upon the honest and reasonable belief of the party commencing the prosecution. * * * The prosecutor must not only actually believe in the guilt of the accused, but the belief must also exist in the defendant's mind at the time of the proceeding, and must be supported by circumstances sufficiently strong in themselves to warrant a reasonably cautious or prudent man in that belief."

Far from having reason to believe or actually believing that the respondent here had violated the law by willfully and knowingly trading the truck to the appellant without disclosing the existence of a valid lien thereon, I think that the evidence abundantly supports the inference that appellant's

agents here were not in the slightest degree concerned with whether respondent was guilty or innocent. It is quite clear that they were not at all interested in bringing a supposed criminal to justice. Appellant's agents repeatedly testified, in effect, that the sole purpose of the prosecution was to, force respondent to pay Floyd's claim, or make some settlement thereof, to the end that appellant could get a clear record title to the truck.

Clearly demonstrative of what appellant had reason to believe and actually did believe, I think, is the following testimony on the part of Webster who actually signed the warrant:

"Q. Now, on each occasion you went, Mr. Parrott told you that he would see Mr. Floyd about it?

"A. Yes, sir.

"Q. All right, then on each occasion you knew there was some question up between Mr. Parrott and Mr. Floyd as to whether or not there was any balance due?

"A. I figured there was a mixup somewhere.

"Q. You figured there was some misunderstanding on one side or the other, is that right?

"A. Yes, sir. Mr. Floyd—usually he would sign one."

The foregoing is clearly inconsistent with any belief on the part of the appellant that respondent had either willfully or knowingly traded the pickup truck to appellant without disclosing the existence of a valid lien thereon.

The record will reflect that both respondent and Floyd are apparently quite solvent. The appellant made no effort to clear the title to the truck by any civil proceeding. I think the entire record is susceptible of the inference that the appellant simply became exasperated with the respondent because he did not more promptly arrange for some disposition of Floyd's claim and was quite willing to use a criminal prosecution, as opposed to any civil process, to force the issue, without any thought or regard for the innocence of the respondent, or the consequent results to him.

Appellant, among other things, argues that it acted on the advice of counsel, and is, therefore, insulated against any liability. While the record shows that the magistrate who issued the warrant, Honorable Russell Floyd, is also a practicing attorney, the evidence is clearly susceptible of the inference that he was contacted in his capacity as magistrate, rather than as an attorney for legal advice. Even if he were consulted as an attorney, the evidence does not disclose that either all of the facts, or the actual belief of the appellant were made known to him. Mr. Webster testified as follows:

"Q. What did you tell Mr. Floyd about this matter? (referring to the magistrate.)

"A. I told Mr. Floyd we'd gotten the title back with a lien on it to the Floyd Motor Company and I wanted to see what we could do about collecting it.

"Q. Did you tell him about your trips to see Mr. Parrott?

"A. Yes, sir."

Moreover, the record does not disclose that the magistrate actually advised appellant to prosecute or that it had probable cause for doing so. The gist of the advice that he gave Mr. Webster was merely that he was entitled to a warrant if he wanted it. It does not appear anywhere that Webster fully disclosed to the magistrate everything that appellant knew, or should have known about the matter, or his belief that the entire matter was the result of a misunderstanding between Floyd and respondent, rather than any conscious wrongdoing on the part of the respondent.

The weight of authority is that the advice of a magistrate is not available as a defense to a defendant in a suit for malicious prosecution. 34 Am. Jur. 749, Malicious Prosecution, Section 73. The fact that the magistrate happens to be also a lawyer has been held not to change the rule for the reason that the policy of the law forbids the magistrate to act as an attorney or to advise in regard to a prosecution to be instituted before him, and for the further reason that in giving advice, the magistrate is not acting in the capacity of an attorney.

· Far from the evidence being susceptible of no other reasonable inference than that there was probable cause in this case, I think the evidence tends to show a reckless and wanton abuse of criminal process, without any regard to the guilt, or innocence, of the respondent or the consequences to him.

· For all of the foregoing reasons, I most respectfully dissent.

LEWIS, J., concurs.